Barbara ASBILL, Plaintiff-Appellee,

v.

HOUSING AUTHORITY OF the CHOCTAW NATION OF OKLAHOMA, et al., Defendants-Appellants.

No. 82-1789.

United States Court of Appeals, Tenth Circuit.

Feb. 2, 1984.

Joe Stamper of Stamper, Otis & Burrage, Antlers, Okl., for plaintiff-appellee.

Bob Rabon of Kile, Rabon & Pullin, Hugo, Okl., for defendants-appellants.

Before BARRETT and LOGAN, Circuit Judges, and CHILSON,* Senior District Judge.

BARRETT, Circuit Judge.

Plaintiff, Barbara Asbill (Asbill), brought this § 1983 civil rights suit against the Housing Authority of the Choctaw Nation of Oklahoma ("the Authority"), various members of the Authority's Board of Commissioners, and the Chief of the Choctaw Nation of Oklahoma. Asbill alleged that the defendants violated her constitutional rights by discharging her from her position as an outreach worker with the Authority.

Specifically, Asbill claimed that she possessed a property interest in her continued employment with the Authority and a liberty interest in her professional reputation. These interests, Asbill averred, were unlawfully taken from her pursuant to procedures which did not comport with due process as guaranteed by the fourteenth amendment. In addition, she claimed the defendants unlawfully discharged her in retaliation for the free exercise of her first amendment rights.

The case was tried to a jury which returned a general verdict in favor of Mrs. Asbill. The defendants appeal from the judgment entered upon the verdict, claiming, *inter alia,* that there is no basis in law supporting liability and, alternatively, that even if liability were properly found portions of the damages awarded are contrary to law.

## BACKGROUND

This case arose out of confusion surrounding the transition of leadership of the Authority in 1978 and 1979. The Authority is an agency of the State of Oklahoma organized and run by and for the benefit of the Choctaw Nation; its purpose is to provide decent housing for low and moderate income Indian families in Southeastern Oklahoma. The Authority is administered

---

* Honorable Hatfield Chilson, Senior District Court Judge for the District of Colorado, sitting by designation.

by a board of five commissioners appointed by the popularly elected Chief of the Choctaw Nation.

Clark David Gardner was Chief of the Choctaw Nation until his death in January of 1978. The Bureau of Indian Affairs then appointed Emory Spears to serve as "coordinator of tribal affairs" until a new Chief could be elected. Before this election took place, however, Spears reappointed three of the Authority's Commissioners whose terms had expired. Spears authority to make these appointments was the issue which sparked the controversy in this case.

In April of 1978, the Choctaw Nation elected Holis E. Roberts as its new Chief. In February of 1979, Chief Roberts replaced the Spears appointees, believing that the Commissioners could be appointed only by the elected Chief of the Nation. The Executive Director of the Authority, Charles L. McIntyre, disputed Chief Roberts' replacement of the three Commissioners. On February 27, 1979, the "new" board then voted to terminate McIntyre and named Appellant George Thompson as the new Executive Director.

Out of this imbroglio sprang a new one involving Asbill. After the Board terminated McIntyre, it attempted to hold its monthly meeting on March 6, 1979, in the Authority's auditorium. When the members of the "new board" arrived, however, they found the replaced members, including McIntyre, sitting at the meeting table at the front of the auditorium. In addition, the auditorium was full of spectators and Authority employees; the atmosphere was noisy and tension-filled.

In an effort to conduct business, the "new board" set up a table at the back of the auditorium. The new director, Thompson, attempted to convince the crowd that the new board was the proper board and that its authority had been approved by the Department of Housing and Urban Affairs. Thompson stated to the crowd that they should recognize the new board members and himself as officially occupying their respective positions.

Asbill, however, refused to do this. She stated to the crowd that she "still worked for Mr. McIntyre and would remain there until he told her to go." (Tr. 282). When asked to move to the back of the auditorium where the new board was sitting, Asbill refused and remained quietly in her chair at the front of the auditorium.

Thompson testified that at the end of the meeting he immediately prepared Asbill's termination letter, which read in pertinent part as follows:

"In view of the fact you refused to recognize the Board of Commissioners and the Acting Director of the Housing Authority of the Choctaw Nation of Oklahoma, I have no alternative but to advise you, your employment with the Housing Authority is hereby terminated effective March 7, 1979." (Tr. 284).

Thompson also testified that he prepared this letter with no knowledge that after the meeting Asbill joined a picket line outside the building organized to protest the authority of the new board.

On February 20, 1981, Asbill brought this action pursuant to 42 U.S.C. § 1983 (1979) alleging that Thompson "upon the direction and with the approval of the other defendants .... wrongfully .... and without affording her notice or due process, terminated plaintiff's employment" and that the defendants deprived her of "rights, privileges, and immunities secured ... by the constitutional laws of the United States" and that she suffered "stigma to her reputation", depriving her of liberty and property. (Appellants Brief at 4). At trial, Asbill was permitted, over objections, to offer evidence of the denial of her first amendment rights, although such a claim did not appear specifically in the complaint.

## BASIS OF THE CLAIM

*The Property Interest:* In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court discussed the basis for a public employee's claim of a property right in continued employment. That right, held the Court, derives not from an employee's "abstract need or desire" for the employment, but from a "legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. at 2709. The Court explained that legitimate claims of entitle-

ment arose from *independent sources* such as state law, rules, or understandings that secure benefits to an employee. *Id.*

Asbill contends that the Authority's Grievance Procedure constitutes such an independent source supporting her "legitimate claim of entitlement" to future employment. The Grievance Procedure relied upon by Asbill, although ambiguous, lays out certain procedures to be followed in termination disputes; it can be read to grant a permanent employee the rights to a pre-termination hearing and a two week notice of dismissal.[1]

By themselves, however, these procedural protections do not support a "legitimate claim of entitlement" to future employment. At best, they merely support a claim of entitlement to the procedural protections themselves. At least five circuits have adopted the view that procedural protections alone do not create a protected property right in future employment; such a

right attaches only when there are substantive restrictions on the employer's discretion.[2] For example, if a statute, regulation, or policy specifies the grounds on which an employee may be discharged, or restricts the reasons for discharge to "just cause shown," then the employee has a right to continued employment until such grounds or causes are shown. This court has also indicated that a property right to future employment may attach when public employees hold contractual rights to continuing employment under formal tenure grounds, or when the employment is set for a fixed term or commission. *Abeyta v. Town of Taos,* 499 F.2d 323, 327 (10th Cir. 1974).

There is no evidence in the record suggesting any substantive restriction on the Authority's power to discharge Asbill. Her employment must be considered to have been terminable at will. Accordingly, she possessed no property right in continued employment and the trial court erred in submitting this claim to the jury as part of her alleged due process violation.[3]

---

1. The procedure relied upon by Mrs. Asbill reads in pertinent part as follows:

   HOUSING AUTHORITY OF THE CHOC-TAW NATION OF OKLAHOMA
   Personnel Grievance Procedure
   . . . .
   2. Any grievance having to do with termination shall be resolved as follows:
   A. Should the employee be on probation by reason of length of time of employment, the decision of the Executive Director shall be final.
   B. Should the employee have completed the temporary appointment and advances to a permanent appointment, in this instance the employee may, if he disagrees with the decision as ordered by the Executive Director, request a hearing before the official Board. This meeting shall be a closed meeting unless the complainant requests an open hearing.
   3. The Board of Commissioners shall schedule the hearing at a time and place convenient to the Complainant and the Executive Director, and shall notify each in writing of the time and place, together with the procedures governing the hearing, as follows:
   A. The Board of Commissioners shall afford the complainant a fair and impartial hearing including:
   1. The opportunity to examine, at the complainant's expense, copies of all relevant documents, records and regulations of the Authority.
   2. The right to be represented by counsel or other chosen representatives.

3. The right to present evidence and arguments to the Authority, and to confront and cross-examine witnesses upon whose information the Authority relies.
4. In the event that the hearing results in the dismissal of the employee, then he shall be entitled to certain rights as follows:
1. A two week notice of intended dismissal.

2. *See Suckle v. Madison General Hospital,* 499 F.2d 1364, 1366 (7th Cir.1974); *Cofone v. Manson,* 594 F.2d 934, 938 (2nd Cir.1979); *Wells Fargo Armored Service v. Georgia Pub. Ser. Comm.,* 547 F.2d 938, 942 (5th Cir.1977); *Lake Michigan Col. Fed. of Teachers v. Lake Michigan Comm. Col.,* 518 F.2d 1091, 1095 (6th Cir. 1975); *Hayward v. Henderson,* 623 F.2d 596, 597 (9th Cir.1980).

3. Fed.R.Civ.P. 51 states that "[n]o party may assign as error the giving of . . . an instruction unless he objects thereto . . . stating distinctly the matter to which he objects and the grounds of his objection." Appellant Authority did not technically comply with this rule in that its objections to Asbill's due process claims were not voiced during the instruction conference. At that stage of the trial, appellants merely expressed certain objections to the instructions as offered and not to the giving of the instructions themselves.

It is clear from the record, however, that the appellants followed this course out of the knowledge that the court had previously decided to present the claims to the jury. Appellant

■ *The Liberty Interest:* Mrs. Asbill also alleged that her professional reputation was tarnished by the manner in which she was terminated by the Authority. She claimed that Thompson's statements in the letter of dismissal "stigmatized" her, thereby limiting her freedom to pursue future employment. Thus, she concluded, by denying her the opportunity to rebut these statements at a hearing, the Authority deprived her of a liberty interest without due process in violation of the fourteenth amendment.

The Supreme Court, however, has placed several limitations upon a public employee's right to allege a deprivation of liberty under these circumstances. In a series of cases, the Court has held that for an employee to make a successful liberty deprivation claim she must show that her dismissal resulted in the *publication*[4] of information which was *false*[5] and *stigmatizing*[6]—information which had the general effect of curtailing her future freedom of choice or action.

We hold that Asbill's claim falls short of meeting these requirements.[7] First, Asbill admitted that Thompson's statements as to why she was discharged were true (Tr. 160). Second, it does not appear from the record that Thompson's statements were published outside the state government; such intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication: "to be made public." *See Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976). Third, assuming that Thompson's statements were false and published, it is doubtful that these statements were of the magnitude that could be considered "stigmatizing." It may

well be true that Asbill has experienced some difficulties in obtaining employment as a result of her discharge; certainly, termination from employment constitutes a "black mark" on any employee's resume. It is much more speculative, however, to conclude that Asbill's difficulties are a result of Thompson's statements as to the *reasons* for her discharge. Arguably, the reasons for the discharge are no more stigmatizing than the discharge itself.[8]

The Supreme Court has indicated that for statements to be stigmatizing they must rise to such a serious level as to place the employee's good name, reputation, honor, or integrity at stake. *Board of Regents v. Roth,* supra 408 U.S. at 573, 92 S.Ct. at 2707 (1971). As an example, the Court has noted that a charge of dishonesty or immorality would be stigmatizing. *Id.* Such charges attach like a "badge of infamy" to an employee—how can they be satisfactorily explained or justified to future employers? Thompson's statements, on the other hand, do not directly attack the character or integrity of Asbill. Rather, they indicate that Asbill disagreed with him on the question of his authority. Considering the circumstances, Asbill could explain this disagreement to future employers in a much more satisfactory manner than a statement denigrating her morality, credibility, or integrity. It is true that the very need for explanation may make Asbill less desirable to some employers, but the Supreme Court has indicated that circumstances which make an employee "somewhat less attractive" to employers would hardly establish the kind of "foreclosure of opportunities amounting to a deprivation of liberty." *Id.* at 574 note 13, 92 S.Ct. at 2707 note 13.

argued at least four times before and during the trial that Asbill's due process claims were inopposite. Each time, however, the court denied Appellant's motion. Under these circumstances, Appellant's failure to object at the instruction conference may be disregarded; their position had been previously made clear to the court and it was plain that further objection would have been unavailing. *See* Wright and Miller, *Federal Practice and Procedure* § 2553 and cases cited therein.

4. *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976).

5. *Codd v. Velger,* 429 U.S. 624, 638 n. 11, 97 S.Ct. 882, 889 n. 11, 51 L.Ed.2d 92 (1977).

6. *See, Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1971).

7. *See supra* note 3.

8. Indeed, Thompson's statements concerning Asbill's discharge suggest positive attributes of her character, namely her loyalty to the person she perceived to be her superior.

**1504**

To summarize, Asbill's liberty deprivation claim must fail because Thompson's statements were not false, were not made public, and were not stigmatizing. Under these circumstances, a hearing was not constitutionally required. We hold that the trial court erred in submitting this claim to the jury.

*The First Amendment Claim:* The final basis supporting Asbill's § 1983 action is her claim that the Authority terminated her in retaliation for the free exercise of her first amendment rights. We cannot say there is no evidence in the record supporting this claim; if the jury had specifically found for Asbill on this basis, such a finding may not have been clearly erroneous. The jury, however, returned a general verdict in this case making it impossible for us to know the basis of the jurors' conclusion.

▮ Regarding the review of general verdicts, the Supreme Court has noted: "[I]ts generality prevents us from perceiving upon which plea they found. If, therefore, upon any one issue error was committed, either in the admission of evidence, or in the charge of the court, the verdict cannot be upheld ...." *Sunkist Growers v. Winckler & Smith Citrus Products Co.,* 370 U.S. 19, 30, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305 (1961) [quoting *Maryland v. Baldwin,* 112 U.S. 490, 493, 5 S.Ct. 278, 279, 28 L.Ed. 822 (1884) ].[9] We note this holding does not paint with as broad a brush as appears from the language quoted. As with all errors committed at trial, a litmus test for reversal is whether the appellant was thereby unjustly prejudiced. *See* Fed.R.Civ.P. 61; 28 U.S.C. § 2111 (1976). A general verdict may be upheld if it appears that the errors

committed were not "vital," or prejudicial to the "substantial rights" of the objecting party. *See Wilmington Mining Star Mining Co. v. Fulton,* 205 U.S. 60, 79, 27 S.Ct. 412, 419, 51 L.Ed. 708 (1906).

▮ In the present case, if Asbill's first amendment claim were strongly and clearly supported by the record, we could possibly affirm the verdict on a harmless error theory. As it stands, however, the first amendment claim could be supported only by the jury's finding in Asbill's favor on two extremely "close" factual questions.[10] Under these circumstances, we cannot say that the erroneous submission of the due process claims to the jury constituted harmless error. It is clear that the jury may well have based its verdict upon these claims; we cannot be "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." *E.I. duPont de Nemours & Company v. Berkley and Company,* 620 F.2d 1247, 1258 (8th Cir.1980) [*citing Gardner v. General Motors Corporation,* 507 F.2d 525, 529 (10th Cir.1974) ]. We, therefore, hold that the judgment must be reversed and the cause remanded for a new trial.[11]

## DAMAGES

The jury awarded $200,000 in actual and punitive damages to Asbill. Out of this total, $137,000 was assessed against the Authority, $50,000 in actual damages and $87,500 in punitive damages. The parties agree that the Authority is a state agency. At trial, however, they did not address the issue of whether *all* Oklahoma state agencies are liable in damages, actual or punitive, in § 1983 actions.

---

**9.** *See also Malandris v. Merrill Lynch, Pierce, Fenner and Smith Incorporated,* 703 F.2d 1152, 1176 n. 20, (10th Cir.1981); *Ely v. Blevins,* 706 F.2d 1247, 1257 (8th Cir.1980); *Borger v. Yam-Nemours & Co. v. Berkley and Co. Inc.,* 620 F.2d, 1247, 1257 (8th Cir.1980); *Borger v. Yamaha Intern. Corp.,* 625 F.2d 390, 398, (2nd Cir. 1980); *Hayes v. Solomon,* 597 F.2d 958, 985 (5th Cir.1979); *Ayoub v. Spencer,* 550 F.2d 164, 168 n. 7 (3rd Cir.1977).

**10.** Those questions were: 1) Was Asbill's speech protected by the first amendment or was it unprotected insubordination? 2) Was

the Authority entitled to the defense of good faith?

**11.** This case illustrates the usefulness of special verdicts or interrogatories in cases where more than one claim is made against the defendant. *See generally* Wright, *The Use of Special Verdicts in Federal Courts,* 38 F.R.D. 199 (1965); Green, *The Submission of Special Verdicts in Negligence Cases,* 17 U.Miami L.Rev. 469 (1963); Comment, *Special Verdicts: Rule 49 of the Federal Rules of Civil Procedure,* 74 Yale L.J. 483 (1965).

Some state agencies are created to perform specially defined, limited purposes, while others are created to perform broad, general purposes. All state agencies are created by legislative acts which generally define the extent to which the agency is liable in actions brought against it. The parties, on remand, should address the issue of whether the Authority is a specially-created state agency with defined, limited purposes and whether this qualifies the Authority as a municipality exempt from assessment of punitive damages in § 1983 actions pursuant to the Supreme Court's holding in *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). The *Newport* decision rested, in part, upon the notion that an entity is incapable of malice, and that an award of punitive damages "punishes" only the taxpayers. *Id.* at 267, 101 S.Ct. at 2759. The trial court should further determine, if the Authority is not found to be a municipality under *Newport,* whether the Authority is an agency of the State of Oklahoma subject to a suit for damages. *See Williams v. Eaton,* 443 F.2d 422 (10th Cir.1971). Waiver of immunity conferred by the eleventh amendment to the United States Constitution should be addressed. *See Ford Motor Co. v. Department of Treasury of Indiana,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). The parties, and the trial court on remand, should give careful consideration to the question of the status of the Authority under Oklahoma law and the extent it may be liable in damages, both actual and punitive.

REVERSED AND REMANDED.